UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
RALIK BAILEY,

                  Petitioner,

        -against-

SUPERINTENDENT GERALD JONES,

                  Respondent.
------------------------------------------------------x

**MEMORANDUM & ORDER**

17 CV 3944 (RJD)

DEARIE, District Judge.

Before the Court is the application of petitioner Ralik Bailey for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  As a result of his role in the armed robbery of a small Brooklyn insurance agency, petitioner was convicted in November 1995, after trial in absentia in Supreme Court, Kings County, of three counts of Robbery in the First Degree (N.Y. Penal Law § 160.15[4]), adjudicated a second felony offender, and sentenced in absentia to two concurrent prison terms of 12 ½ years plus a third consecutive term of the same length.  He remained a fugitive and did not begin serving that sentence until his arrest in 2001.  In 2002, on his motion pursuant to C.P.L. § 440.10, the trial court reduced the sentence to a total of 12 ½ years by converting the consecutive term to a third concurrent term.  Petitioner was paroled in August 2019.

As grounds for habeas relief, petitioner asserts (1) that the pretrial line-up was unduly suggestive, the resulting identifications unreliable, and his trial therefore unfair, ECF No. 1 at 9; (2) that trial counsel rendered ineffective assistance by opening the door, through his cross-examination of a police witness, to the admission of inflammatory details of petitioner's alleged involvement in uncharged robberies, ECF No. 1 at 5; (3) that he was denied a fair trial by the admission of his arrest photograph, other photograph-related evidence, testimony relating to his

accomplice, and certain remarks of the prosecutor during summation, ECF No. 1 at 6; and (4) that the court's alleged mishandling of one of the jury's notes also deprived him of his right to a fair trial and of the right to counsel at that phase of the proceeding.  ECF No. 1 at 8.  Petitioner did not challenge on appeal, and does not challenge here, the decision to try and sentence him in his absence.[1]

As will be discussed, all four claims were presented to the Appellate Division, which rejected them on the merits, on procedural grounds, or both.  People v. Bailey, 127 A.D.3d 1222 (2d Dep't 2015), lv. app. denied, 27 N.Y.3d 991 (2016).

For the reasons to be discussed, the standards for disturbing the state court's decision have not been met.  The application is therefore denied and the petition dismissed.

## BACKGROUND

### I.   TRIAL EVIDENCE: THE COMMISSION OF THE ROBBERY ON OCTOBER 21, 1994

The principal evidence came from the crime's victims, Brenda Thomas, the owner of the Bernstein Insurance Company in Brooklyn, and her employee Georgette Mendes.  Their

---

[1] At the start of petitioner's Dunaway/Wade hearing on October 11, 1995, the court reinstated his release on $5,000 bail while issuing a warning, as required by People v. Parker, 57 N.Y.2d 136 (1982), that trial would occur in his absence if he failed to appear, and that if convicted in absentia, he would receive the maximum authorized prison sentence.   ECF No. 10-2 at 2-5. Petitioner was present during jury selection and as his trial got underway, but left the courthouse during a break in the proceedings on October 27, 1995.  ECF No. 10-4 at 139. The trial court initially declined to issue a bench warrant, allowing petitioner 48 hours to return.  Upon application by the prosecution, who explained that the timing of petitioner's disappearance corresponded with the disclosure to the defense of inculpatory telephone records, the court changed its mind and issued the warrant.  ECF No. 10-4 at 141-47.  On October 30, 1995, the trial court held a Parker hearing during which prosecutorial staff testified that searches for petitioner were conducted at all local hospitals and morgues and in all applicable judicial and corrections databases.  At the close of the hearing, the court concluded that petitioner had voluntarily absented himself and that trial would proceed.  ECF No. 10-4 at 157-75.

testimony established that several days before the robbery, petitioner had visited the office at least once and talked with Mendes, for longer than a minute, about the cost of car insurance, and that he came on a separate occasion to ask what time the office closed.  He did not give his name.

Just after closing time on October 21, 1994, at approximately 7:05 p.m., petitioner and his accomplice Darryl Bennett appeared at the office door.  Thomas told Mendes not to let the men in after hours, but Mendes said she recognized petitioner from his previous visit.  Thomas then authorized her to buzz the men in.

Upon entry, petitioner pulled out a pistol and held it to Thomas's head while Bennett grabbed Mendes.  Both women were then forced into a back room.  There, petitioner pushed Thomas down to the floor while Bennet directed Mendes to lie face-down on top of her. Petitioner stood at the door to the back room while Bennett stole what cash he could find in the main office.  At one point, petitioner dragged Mendes back into the main office demanding she show him the rest of the money.  Returning Mendes to the back room, petitioner then ripped out her earring while Bennett took Thomas's watch and wedding band.  Petitioner threatened to tie up the women but could not find any cords or rope.  Bennett or petitioner then had the women undress.  The robbers again pushed the women to the floor, directed them to remain there for thirty-minutes, and fled.  The victims immediately telephoned 911.

## II.    THE ISSUE OF IDENTIFICATION: THE PRE-TRIAL HEARING

Because Brenda Thomas had twice made an inaccurate identification before the positive identification at a lineup, the reliability of the identification evidence became the focus at trial, as it had been at the pre-trial suppression hearing, which is described here first before returning to the trial evidence.

At the pre-trial hearing, Detective Charles Platt testified that he picked up the paperwork

on the case on October 24, 1994, three days after the crime occurred. He learned that the two robbers were described as black males, one tall and stocky, the other shorter and lighter-skinned. Platt also learned that several hours after the crime, Thomas and Mendes viewed photograph books at the police precinct.  Mendes picked out two different photographs of petitioner—an arrest photograph from 1990, and a Polaroid taken by a precinct detective.  Thomas picked out a photograph of the man she believed was the tall and stocky robber; the man was a Texas inmate, not petitioner, but Thomas was not told this fact.[2]

With this information, Platt interviewed Mendes by telephone.  She described petitioner as clean-shaven, dark-skinned, approximately 22 years old, 6'3'' tall, and 230 pounds. (Petitioner was in fact 19 years old at the time of the crimes). Later that same day (October 24, 1994), Platt and his partner Detective Mark Del Pino brought two arrays of six photographs each to the insurance company office.  One included a more recent photograph of petitioner than was in the books at the precinct.  Shown the arrays, Mendes pointed to petitioner's photograph and identified him as the larger of the two robbers.  Thomas did not initially identify anyone, and upon a second viewing, pointed to a photograph of a filler, not petitioner.[3]

Three months later, on January 24, 1995, petitioner was arrested and Del Pino conducted a line-up.  Del Pino went to a local shelter to find fillers who resembled petitioner.  He was not

---

[2] During the defense case at trial, counsel called Police Officer Patrick Cregin, who was on duty at the precinct on the night of October 21, 1994 and showed the photograph books to Thomas and Mendes.  His testimony is summarized infra at p. 10.

[3] At trial there was testimony that Thomas's son Wayne had also been at the office that evening, that he left only moments before the crime occurred and returned shortly afterward.  Wayne did not testify at trial or view a lineup, but at the pretrial hearing Platt testified that he showed Wayne the photo array and that Wayne pointed to petitioner's picture as one of the two men he saw the night of the robbery.

4

aware that petitioner had been described as stocky or fat and believed him to weigh approximately 200 pounds.  He asked the fillers their ages but did not write down their answers, and did not record their height and weight.  ECF No. 10-2 at 98.

A color photograph that Del Pino took of the lineup is in the record furnished to this Court.  In it, all the participants are seated and appear to be of the same height, which conforms to Del Pino's hearing testimony that to make the participants appear of similar height, he had them sit and adjusted the heights of their chairs.  ECF No. 10-2 at 84.  In the photograph, all participants are also wearing hats; De Pino testified that he had them do so because petitioner had a distinctive hairstyle.  Id. at 85.  Finally, the picture shows that the five fillers are wearing dark clothes while petitioner is in a white shirt.  This detail was not explored in the testimony except that Del Pino said he did not ask petitioner or any of the fillers to change their clothing.  At the close of the hearing, counsel argued that this detail was the equivalent of "put[ting] a beam of light" on petitioner.  Id. at 115.

Before viewing the lineup, Mendes and Thomas waited in the precinct basement, where "wanted" posters were hanging on the walls.  Del Pino testified that he took down the poster of petitioner before Mendes and Thomas arrived.  Id. at 111-12.  Mendes viewed the lineup first and within three or four seconds identified petitioner.  Id. at 88.  Mendes did not speak to Thomas, who viewed the lineup next and identified petitioner within ten seconds.  Id.

Colloquy among the hearing court and counsel then occurred concerning Brenda Thomas's prior misidentifications and the claimed distinctiveness of petitioner's white shirt.  The court then asked to hear from Thomas.  She testified that when examining the photograph books at the precinct several hours after the crime occurred, there was "no doubt in [her] mind" that the individual in the photo she picked was the larger of the two men who committed the robbery.

5

Id. at 136.  (As will be discussed, she would later retreat from this position at trial by saying there that she picked someone who only "resembled" the robber).  Thomas also addressed the photo arrays she was shown several days later at her office; she said she identified both robbers, including the larger person, almost immediately.  Thomas did not reveal awareness that on both occasions her identifications of the larger robber were mistaken.  The subject was not explored during her hearing testimony.  Id. at 128-131

At the close of the hearing the parties stipulated that the photograph of petitioner that Mendes picked at the police precinct was from a September 1990 arrest in a case that was dismissed and sealed in Family Court.

The hearing court denied the branch of omnibus motion which was to suppress the lineup identification in an oral decision that did not expressly address the lineup itself, stating simply that suppression of the identification testimony was not warranted.  See id. at 227 et seq.  In its decision the hearing court found that the use of petitioner's photo from a sealed matter violated Section 160.50 of New York's Criminal Procedure Law, which requires the return or destruction of any photographs of a defendant in such matters, N.Y. C.P.L. § 160.50, but also ruled that no constitutional violation occurred.  The court further ruled that at trial, the defense could question Thomas about her two pre-lineup misidentifications and that doing so would not open the door to allow the state to question Mendes about her pre-lineup identifications of petitioner.

## III.   THE IDENTIFICATION EVIDENCE AT TRIAL

### A.   The Lineup

Thomas, Mendes, and Del Pino offered at trial accounts of the lineup consistent in material respects with their testimony at the hearing.  Additionally, defense counsel pressed Del Pino on the colors of petitioner's and the filler's clothing.  Del Pino stated that he did not have

extra shirts at the precinct and did not ask any of the lineup participants to change their clothes. ECF No. 11-1 at 69.  He also stated that all the participants' clothing was similar because they all had their sleeves rolled up.  Id. at 65.

Counsel also pressed Mendes and Thomas about the color of the lineup participants' shirts and their ages.  When asked to recall the January 1995 lineup while testifying at trial in November 1995, Mendes recalled that she picked out the man wearing a white shirt (id. at 304), while Thomas hedged (id. at 177)[4], but neither said that petitioner's white shirt was the reason for her identification.  Mendes testified that she could not discern the ages of the lineup participants, while Thomas recalled that the fillers appeared to be somewhat older than petitioner.  Both witnesses testified, however, that they were focused on the lineup participants' faces.  Thomas testified as follows:

> Q.    When you viewed the lineup, you identified an individual that you later learned to be [petitioner]?
>
> A.    Yes.
>
> Q.    When you made that identification, what were you relying upon?
>
> A.    The person who came into my office.

---

[4] Thomas testified as follows:
Q. Do you remember what color shirt the person that was holding number two, what color shirt he had?
A. I don't remember the color shirt.  I don't remember if it was a white shirt.
 Q.  Excuse me?
A. I don't remember the color shirt.
Q.  What did you just say before that?
A. I don't remember if it was a white shirt he was wearing.
A.  You don't remember if it was a white shirt?
A.  No.
Q.  But it might have been a white shirt?
A. Yes.  (Id. at 177).

Q.    And when you say the person that [ ] came into your office, what about that person did you remember? What part of his body?

A.    His face.

Q.    When [petitioner] came into your store and he pointed a gun at you, did you have an opportunity to see his face?

A.    Yes.  (Id. at 223-24).

Mendes, likewise, testified that she recognized petitioner's face from the conversation they had about purchasing insurance during his visit to the office before the robbery and from his second, shorter visit to the office to ask what time the office closed.  Id. at 240-45, 260.  She reiterated that the only reason she buzzed the men in on the night of the robbery was because she told her boss Thomas that she recognized them.  Id. at 293.  Mendes was also shown a photograph of the lineup at trial and testified that the person she picked out at the time, in position two, was the same person who came to her store to inquire about insurance and who later came and committed the robbery with an accomplice.  ECF No. 11-2 at 19.

After summations, however, the prosecution gave defense counsel a Polaroid taken of petitioner at the precinct on the day of his arrest in January 1995.  ECF No. 11-4 at 40.[5]  In the photo, petitioner is wearing a jacket over his white shirt.  The court admitted the photo and reopened summations to allow both sides to address it.  Defense counsel argued that the photo

---

[5] The photograph handed to the defense after summations was not petitioner's official arrest photo.  A 12-by-16 inch enlargement of that photo, depicting petitioner in a front and side view, had been admitted earlier in the trial for the purpose of affording Thomas and Mendes the opportunity to make an in-trial identification in petitioner's absence.  The court, noting that petitioner had absconded, admitted the photo despite defense counsel's willingness to stipulate that the person chosen in the lineup was the person on trial.  ECF No. 11-1 at 56-58.  Thomas and Mendes in turn then identified the man in the arrest photograph as the man who committed the charged robberies.

contradicted Del Pino's testimony that individuals appeared in the lineup "wearing whatever it is they were wearing" and that "that's how [petitioner] wound up there with a white shirt." Id. at 43.  The prosecutor stated that the photo was taken "as [petitioner] walked into the precinct" and suggested that, "in January I'm sure that there was a lot of heat inside the precinct, I'm sure that possibly [petitioner] requested to take the jacket off himself." Id. at 44.

      B.   The Reliability of Thomas's Identification

During the prosecution's case, the defense pressed Thomas on her capacity to observe and explored minor inconsistencies among her several prior accounts of the crime.  For example, at trial she testified that she had seen petitioner in the office on three occasions before the robbery, whereas she told the grand jury she had seen him only once before, and told the police it was twice.  (Mendes, who talked with petitioner about buying car insurance, was sure that he had come to the office on two occasions before the robbery).  Additionally, Thomas estimated that she was able to look directly at petitioner's face for only 15 seconds because when he pointed the gun at her head he also directed her not to look at him, and while confined in the back room she was ordered to lie with her face toward the floor.

With respect to her viewing of the photograph books at the precinct, Thomas retreated from her hearing testimony by saying that she chose a photograph of a man with a "similar resemblance" to the larger of the two robbers. ECF No. 11-1 at 164.  See also id. at 192 ("Q. Do you remember using the word resemble or did you say this is the person who committed the crime? A. I told him the person resembles the person who was at my office.").  She also explained that "when you are looking at a person in the flesh, it's a different thing from looking at a picture." Id. at 193.  Defense counsel sought to introduce the photograph Thomas selected from the photograph books but she did not recognize it at trial.  Counsel showed her the

photographic array that police had shown her at her office three days after the crime and she did not recognize it or remember whether she had selected a photograph from the array.

The fact that Thomas misidentified petitioner came in as part of the defense case, through Police Officer Patrick Cregin, who testified that he showed Thomas approximately fifteen photograph books in the precinct several hours after the crime. Cregin testified that Thomas identified a man in one of the photographs as the "larger" of the two robbers and that the individual in that photograph was not petitioner. ECF No. 11-2 at 108-111. (The remainder of the defense case is discussed infra at pp. 11-13).

C. The Telephone Calls to the Victims

Mendes testified that almost two months after the robbery, on December 17, 1994, at approximately 1:00 a.m., she received a call on her home telephone. She answered and the caller said he was a detective investigating the robbery. Mendes did not recognize his voice. When the caller asked whether she lived at 53 or 58 she said 58, which was not accurate, and hung up. She quickly sensed that the voice was that of the heavier of the two robbers and, after retrieving the incoming number from her phone's caller identification function, she reported the call to police. A NYNEX representative testified that the incoming caller's number was registered to petitioner and corresponded to the street address of one of his relatives. NYNEX records confirmed that a call lasting approximately two minutes was made from petitioner's phone to Mendes's phone at approximately the time stated in her testimony.

The telephone records also showed that only moments before the call to Mendes, a call was placed from petitioner's phone to the telephone registered in Brenda Thomas's name. Thomas did not testify that she received a call.

The prosecution sought to establish a basis for inferring that petitioner acquired the

10

names of the victims from his accomplice Darryl Bennett.  Del Pino testified that he arrested

Bennett on November 1, 1994 (ten days after the robbery and six weeks before the calls to the

victims).  An assistant district attorney then testified that on November 28, 1994, she served

Bennett's attorney with the notice required by N.Y. C.P.L. § 710(30(1)(b) informing Bennett that

Mendes and Thomas had identified him.[6]

## IV.    THE DEFENSE CASE

In addition to calling Officer Cregin, as discussed above, defense counsel called

Detective Platt.  Counsel first elicited that there was a minor discrepancy between Platt's

handwritten notes and his typed report: the former stated that Mendes said that she allowed

petitioner into the office because "she recognized him from prior times" including two days

before the robbery, whereas the latter stated that Mendes said that "she recognized [petitioner]

from earlier that day."  ECF No. 11-3 at 28.

Second, Platt testified that he went to the insurance company office three days after the

robbery and showed Thomas an array containing six photographs, including one of petitioner,

and that Thomas picked someone else as the robber.  Id. at 35.

Third, Platt testified that he was familiar with petitioner even before the October 1994

insurance office robbery because two months earlier, in August 1994, he had arrested him in

relation to other robberies.  Counsel elicited that the arrest occurred because an individual named

---

[6] As discussed infra at pp. 13-15, in summation, the state argued that telephone records
established that Bennett and petitioner spoke between the time of Bennett's arrest and the calls to
the victims; the defense objected that the prosecutor was arguing facts not in evidence, and the
court, reserving judgment at the time, never formally ruled on the objection.  The Court has not
located the referenced phone records in the materials furnished by respondent.

Cornelius Abson, with whom petitioner had a family connection, had furnished incriminating information about petitioner.  Counsel's apparent objective, which he accomplished, was to then elicit that Platt had occasion to place petitioner in twelve different lineups, that no witness to any of the lineups picked petitioner as the robber, and that without an identification petitioner was not charged with any of those crimes. Id. at 39-42.

On cross-examination, however, the prosecution elicited the details of those crimes. (The court overruled counsel's objection on the ground that he had opened the door. Id. at 44).  Platt testified that the lineups followed "a series of robberies in which a larger individual approached elderly people and choked them from behind" while another stole their money.  Id. at 43.  Platt also stated that the individual mentioned in defense counsel's questions, Cornelius Abson, had been identified as the person who went through the victim's pockets while petitioner was the "choker." Id. at 44.   Platt did not think Abson was lying when he implicated petitioner, and believed that petitioner was not picked in any of the lineups because the victims likely could not see who grabbed them from behind.

Counsel pursued the issue further on redirect, apparently seeking to elicit from Platt an admission that certain victims did offer a description of the person who grabbed them from behind that did not match petitioner.  He asked: "You keep saying that in these cases they can't describe the one behind, and you've done this a number of times, but some of them aren't crimes that were committed by more than one person; is that true, detective?" Id. at 59.  Platt replied, "All of these crimes were done by multiple perps." Id.

Counsel persisted still, naming three elderly victims (Jose Ramos, Betty Thomas, and Leon Regis) whose cases he believed involved only a single assailant.  Platt stated that Ramos's case was not part of the group of twelve involving the lineups already discussed, that Thomas

12

was choked unconscious and did not describe her assailant, and that Regis's case involved three

assailants, only two of whom Regis could describe.  Id. at 60-62.

On recross, Platt offered the following summary:

> the victims were all senior citizens, people in their 60's and 70's. They would go
> to a local check cashing place…At least one of perpetrators would be
> inside…they would observe the …victim withdraw a sum of cash, the inside
> person would then point out the victim to at least one person outside, they would
> follow the victims to their residence, get onto the elevator with them and most of
> the cases they would stand behind the victim. Once the elevator closed, they
> would - - one of the perps. would get them in a chokehold [and] choke [the
> victim] completely unconscious.  In several instances the complainants would
> wake up 15 or 20 minutes later with serious neck injuries… [injuries] to the
> larynx, trouble talking, [or] had defecated themselves. Very vicious crimes."

Id. at 63.

## V.  SUMMATIONS AND MOTION FOR MISTRIAL

In his summation, defense counsel argued that Thomas and Mendes were not necessarily

lying but, because of the traumatic nature of what occurred, were likely mistaken and susceptible

to suggestion.  Counsel highlighted the fact that Thomas twice identified the wrong individual as

petitioner and, at the time of the suppression hearing, was under the impression that all three

individuals she selected were the same.  With respect to the phone calls made to the victims, he

argued that there was no proof that petitioner actually used the phone or that he opened the

account registered in his name.  On the subject he opened during the defense case, counsel

suggested that there might be more to the story involving Cornelius Abson in that Abson was

"saying that [petitioner] is committing crimes to help himself" and that the telephone calls to

Mendes and Thomas were "a further attempt by this Cornelius person to further hurt

[petitioner]."  ECF No. 11-3 at 110.

The prosecutor, in relevant part, argued that defense counsel "stood up and told you that

13

[the victims] were lying" and argued that they should be believed because they are victims of a crime and citizens of Brooklyn who would have no incentive to perjure themselves.   ECF No. 11-4 at 20-21.   He argued that Thomas was credible by pointing to the accuracy of her recollection of petitioner's gun, saying that it was "testimony to her good mouth." Id. at 26.   He also stated the defense offered no evidence of misidentification, and that there was evidence of phone calls from Bennett to petitioner to support his belief that Bennett furnished petitioner with the names of the identification witnesses.   The prosecutor also argued that because of the calls from petitioner's phone to the victims, this was a "rare" case where the defendant "gets to tell you himself, through his actions, that he did it." Id. at 31.   He repeated this assertion two additional times.   Id. at 32 ("Could it possibly be a coincidence that the phone call is coming from a line from a relative's house registered in his name, or going to the two witnesses of a crime that he is accused of committing before he's even arrested…So his own actions tell you that he did it") and 37 ("[petitioner] himself tells you he did [it] by making these phone calls").

Finally, in addressing the defense case and Cornelius Abson, the prosecutor urged the jurors both not to consider those uncharged crimes and to credit Abson:

> As far as Cornelius Abson trying to frame up Ralik Bailey, doesn't make sense. . . .we are trying the case before us, it has nothing to do with what happened in August, but [defense counsel] brought in the witness that talked about that.   The People had rested and had no intentions whatsoever in talking about those events because we want to try this case here. [Defense counsel] brought it up, and remember, when he says this was fabricated, and that Cornelius had it out for him, remember the facts of that case, and you determine whether Cornelius Abson had it out for him, and or [sic] whether it was what happened and Cornelius Abson was telling the truth. But I remind you, that has nothing to do with this case. Those past cases, and you cannot use that when deciding what happened in this case.

Id. at 35-36.

Defense counsel moved for a mistrial on the basis of the prosecutor's summation.   Id. at

14

92-95.  Counsel's complaints then, which are petitioner's now, include that the prosecutor (1) derogated defense counsel and mischaracterized his argument by saying that he called the victims liars, (2) improperly vouched for the victims' credibility, (3) mischaracterized the relevance of the telephone records, (4) argued facts not in evidence by stating that petitioner lived at the address where the phone was listed when the evidence was that it a relative's home, and (5) violated petitioner's Fifth Amendment right to remain silent by arguing that through the "actions" of the telephone calls to the victims, petitioner "told" the jury "himself" that he was guilty.  The trial court said it agreed with the prosecutor's assertion that all but one of the challenged remarks were fair comments on the evidence or on the defense arguments and took the Fifth Amendment issue under advisement.  Id. at 97.[7]

## DISCUSSION

### I.   THRESHOLD PROCEDURAL ISSUE

The instant petition is petitioner's second application for habeas relief.

In his first petition, filed in May 2007, petitioner sought reinstatement of his direct appeal after the Appellate Division dismissed it as abandoned.  See Bailey v. Conway, 07-CV-2124 (NG) (VVP).[8]  In that proceeding this Court appointed counsel (Marc DeMarco, Esq.); in a

---

[7] At the prompting of the prosecution at the start of sentencing, ECF No. 12-1 at 3, the court denied the mistrial motion and rejected the Fifth Amendment claim.  See id. at 4 ("With respect to the Fifth Amendment, which I think appears fully argued in the earlier record by [defense counsel], the Court is going to deny that motion as well.")

[8] The record in that proceeding discloses that following petitioner's trial in absentia in late 1995, trial counsel filed a timely notice of appeal but sometime later passed away.  The unperfected appeal was dismissed on the state's motion as abandoned.  Following petitioner's arrest in 2001, he sought, without success, to set aside the verdict and the Appellate Division's dismissal of his appeal through a series of post-conviction proceedings.

report and recommendation dated July 2, 2009, Magistrate Judge Viktor V. Pohorelsky recommended that the petition be granted conditionally; and by order dated July 30, 2009, Judge Nina Gershon adopted the report and recommendation and ordered that petitioner be released from custody unless his direct appeal was reinstated within sixty days.  See Bailey v. Conway, 07-CV-2124 (NG) (VVP) (E.D.N.Y. July 2, 2009) (ECF Nos. 30, 32).  By order dated August 19, 2009, the Appellate Division reinstated petitioner's appeal and assigned counsel, People v. Bailey, Dkt. No. 1995-11493 (2d Dep't Aug. 19, 2009), who then perfected the appeal.[9]

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may consider a second or successive § 2254 motion only if the prisoner has first obtained leave of the Second Circuit Court of Appeals to file it.  See 28 U.S.C. § 2244(b).  Under Second Circuit precedent, "a numerically second petition does not necessarily constitute a 'second' petition for the purposes of AEDPA."  Vasquez v. Parrott, 318 F.3d 387, 389 (2d Cir. 2003) (internal citation and quotation omitted).  Rather, "to be successive, a second [habeas] motion must attack the same judgment that was attacked in the prior motion, and the prior motion must have been decided on the merits."  Vu v. United States, 648 F.3d 111, 113 (2d Cir. 2011)

---

[9] Perfection of the appeal was then delayed because certain portions of the trial transcript were missing from the stenographic minutes.  Upon counsel's motion and the state's consent, a reconstruction hearing was held before the same Supreme Court Justice who presided over petitioner's trial.  The assistant district attorney who prosecuted the case testified to his recollection of the trial with reference to his notes.  At the close of the hearing the court concluded that it was impossible on the record before the court to make a legally adequate reconstruction, and counsel then moved in the Appellate Division for summary reversal of petitioner's conviction and a new trial.  According to respondent, while that motion was pending, the court reporter found the long-missing stenographic notes and produced a complete trial record.  Counsel then withdrew the motion for summary reversal and perfected the appeal.  Relevant here, petitioner did not challenge the accuracy of the trial transcript on appeal and does not do so in his habeas petition.

(internal citation, quotation and alternations omitted).

In <u>Vasquez</u>, a first §2254 petition was not considered an "attack" on the judgment where it "sought release from detention on account of unreasonable delay" but raised no other claims. <u>Vasquez</u>, 318 F.3d at 388.  Reasoning that the first petition "*concerned"* the same conviction as the second petition but "did not *attack* that conviction," <u>id.</u> at 390 (italics in original), the Circuit "h[e]ld that [the] first petition did not count in determining whether a later petition would be 'second or successive' within the meaning of §2244" and that "[i]t follows that [the prisoner] does not require leave of [the Circuit] to file his new §2254 petition with the district court."  <u>Id.</u>

In <u>Urinyi v. United States</u>, 607 F.3d 318 (2d Cir. 2010), the Circuit addressed in the §2255 context facts materially the same as those presented here.  The federal prisoner's first §2255 "did not contend that his sentence had been illegally imposed" but "sought only reinstatement of his right to appeal." <u>Id.</u>   The Circuit concluded that, "[c]onsistent with our reasoning in <u>Vasquez</u>, we hold that Urinyi's prior 2255 motion does not render the present proposed 2255 motion 'second or successive' under [ ] AEDPA," and added that "nothing in [ ] AEDPA indicates that Congress intended the 'second or successive' rules to operate differently with regard to state and federal prisoners." <u>Id.</u> at 321.  The Circuit reaffirmed the holding of <u>Vasquez</u> and <u>Urinyi</u> in <u>Vu</u>.  648 F.3d at 114.

Under these authorities, petitioner's current application for habeas relief is not "second or successive" within the meaning of AEDPA.  Examination of the first petition confirms that petitioner claimed there only the denial of his rights to appeal and to counsel on appeal but did not attack the judgment of conviction.  <u>Bailey v. Conway</u>, 07-CV-2124 (NG) (VVP), ECF No. 1. Accordingly, the Court may proceed to the merits of the instant petition.

## II. General Habeas Standards

Habeas relief is authorized "only on the ground that [an individual] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Where, as here, purportedly federal claims advanced as grounds for habeas relief were already decided by a state court, the habeas court's review of those decisions is highly deferential.  As the habeas statute provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1), as amended by AEDPA.  See generally Shoop v. Hill, 139 S. Ct. 504, 506-07 (2019) ("The federal habeas statute ... imposes important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases. The statute respects the authority and ability of state courts and their dedication to the protection of constitutional rights") (internal quotations and citations omitted); Burt v. Titlow, 571 U.S. 12, 16 (2013) (federal habeas courts "will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy") (internal quotations, citations and alterations omitted);  Renico v. Lett, 559 U.S. 766, 773 (2010) ("AEDPA [ ] imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt") (internal quotations omitted). But see Brumfield v. Cain, 135 S. Ct. 2269, 2277 (2015) ("As we have also observed, however, even in the context of federal habeas, deference does not imply abandonment or

abdication of judicial review, and does not by definition preclude relief.") (internal quotation marks, citation and alterations omitted).

Each component of the standard set forth in the habeas standard has been construed to advance these principles of federalism.  First, as the Supreme Court has explained, "[a] legal principle is 'clearly established within the meaning of this provision only when it is embodied in a holding of this Court," Thayler v. Haynes, 559 U.S. 43, 47 (2010), "as opposed to the dicta," Williams v. Taylor, 529 U.S. 362, 412 (2000), or the holdings of federal appellate courts.  Carey v. Musladin, 549 U.S. 70, 74 (2006).

A state court decision is "contrary to" established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decided a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 406.  The state court decision is an "unreasonable application of" that federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case."  Id. Unreasonableness for section 2254(d)(1) purposes, however, is a "bar [that] is not reached where fairminded jurists could disagree on the correctness of the state court's decision."  Orlando v. Nassau Cty. Dist. Attorney's Office, 915 F.3d 113, 121 (2d Cir. 2019) (internal quotation and citation omitted).  Rather, to be "an unreasonable application" of federal law, a state court decision "must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Shoop, 139 S. Ct. at 507. See also Virginia v. Le Blanc, 137 S. Ct. 1726, 1728 (2017) ("In order for a state court's decision to be an unreasonable application of this Court's case law, the ruling must be

objectively unreasonable, not merely wrong; even clear error will not suffice") (internal quotation marks and citations omitted).

Under the less frequently invoked second branch of § 2254(d), a petitioner may seek habeas relief by challenging the factual basis of the adverse state court ruling.  See 28 U.S.C. § 2254(d)(2) (habeas court may overturn the state court's decision only if it was "based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceedings.").  For purposes of Section 2254(d)(2), a "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  Wood v. Allen, 558 U.S. 290, 301 (2010).  Habeas challenges to a state court's factual findings are also subject to 28 U.S.C. § 2254(e)(1), which provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and that the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."[10]

## III.  ANALYSIS OF PETITIONER'S CLAIMS

### A.  The Lineup Identifications

Petitioner claims that the lineup was unduly suggestive because the fillers were significantly older than he and because they all wore dark clothes while he, wearing a clean white shirt, stood out.  He also says that because Thomas twice misidentified her attacker with certainty before the lineup, it is not mere speculation to suggest that she was actually influenced

---

[10] The Supreme Court and the Second Circuit have declined to address the relationship between Sections 2254(d)(2) and 2254 (e)(1).  See Brumfield, 135 S. Ct. at 2282 ("We have not yet defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)") (internal quotation and citation omitted); Garguilo v. Heath, 586 Fed. App'x 764, 766 n. 1 (2d Cir. Oct. 10, 2014) (same).

by the claimed suggestive details when she chose petitioner at the lineup.

These arguments were thoroughly addressed in the seventy-five-page brief appellate counsel prepared on petitioner's behalf and rejected by the Appellate Division.  People v. Bailey, 127 A.D. 3d 1222 (2d Dep't 2015), lv. app. denied, 27 N.Y.3d 991 (2016).  The Appellate Division held that, "[c]ontrary to [petitioner's] contention, the hearing court properly denied that branch of his omnibus motion which was to suppress testimony regarding a lineup identification."  Id. at 1223.  The court ruled that, "[w]hile lineup participants should have the same general characteristics as those of the suspect, there is no requirement that a defendant in a lineup be surrounded by individuals nearly identical in appearance."  Id.  The court found that, "[h]ere, the photograph taken of the lineup reflects that the fillers sufficiently resembled [petitioner]."  Id.

This Court, in possession of the lineup photograph and based upon review of the trial record, concludes that the Appellate Division's determination is neither unreasonable factually nor an unreasonable application of Supreme Court law within the meaning of AEDPA.

Under applicable Supreme Court law, the admissibility of pretrial identification evidence is subject to a "totality of the circumstances" test in which "reliability" remains "the linchpin."  Manson v. Brathwaite, 432 U.S. 98, 110, 114 (1977).  This rule "permits the admission of the [identification] evidence if, despite the suggestive aspect, the out-of-court identification possesses certain features of reliability."  Id. at 110.   The "factors to be considered are set out in" [Neil v. Biggers, 409 U.S. 188, 199-200 (1972)] [and] include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the [lineup], and the time between the crime and the [lineup.]."  Id. at 114.  "Against these factors is to be weighed

the corrupting effect of the suggestive identification itself."  Id.  Identification evidence fails this test only if the identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  Manson, 432 U.S. at 116 (internal quotation and citation omitted).

The Appellate Division did not unreasonably apply these standards when rejecting petitioner's suggestiveness claim.  Several Biggers factors heavily signal reliability.  Both victims had ample opportunity to view petitioner at the time of the crime: Thomas's fifteen seconds are hardly a mere glance, and Mendes sat face to face with petitioner discussing insurance several days before the robbery and recognized him sufficiently to buzz him in on the night of the robbery.  Both victims also demonstrated a high level of certainty in making a prompt, unhesitating identification at the lineup.  The subject of petitioner's white shirt was fully explored on cross-examination at trial, and while Mendes recalled the shirt and Thomas likely did, neither of the two stated, or offered a basis for inferring, that the color of the shirt rather than recognition of petitioner's face was the reason for her lineup identification.  No other feature of the lineup is even arguably suggestive, as all six lineup participants have similar skin tones, are wearing dark-colored hats, appear to be of similar height in their seated positions and do not appear, from the photograph, to be of discernibly different age groups.

Although Thomas's two mistaken pre-lineup identifications are a Biggers factor arguably compromising reliability, it was not unreasonable for the Appellate Division to conclude that they did not give rise to the "very substantial likelihood of irreparable misidentification" required to find a lineup identification inadmissible.  To the contrary, there can be little doubt about the correctness of the identification.  The fact of the calls to the victims from petitioner's telephone speaks for itself.  More critically, as Mendes reiterated repeatedly in her testimony, she

sufficiently recognized petitioner on the night of the robbery to persuade her boss (Thomas) to allow her to buzz him in.

   B.   Ineffective Assistance of Counsel

Petitioner claims that counsel rendered ineffective assistance by choosing to question Platt about petitioner's participation in lineups in uncharged robberies which, in turn, opened the door to the admission on cross-examination of inflammatory details of those crimes.  Counsel also failed to request a limiting instruction.  The Appellate Division rejected this claim, concluding that petitioner "was not deprived of the effective assistance of counsel under the United States Constitution."  Bailey, 127 A.D.3d at 1223.

The Appellate Division's rejection of petitioner's ineffectiveness claim was not an unreasonable application of Supreme Court law.  Although the familiar standard hardly needs lengthy recitation, its elements are crucial.  Under Strickland v. Washington, 466 U.S. 668 (1984), a petitioner must show, first, that "counsel's representation fell below an objective standard of reasonableness," 466 U.S. at 688, and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  On the performance prong, the court's "inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  Id. at 688.  The dispositive question is "whether the [challenged actions or decisions] were outside the wide range of professionally competent assistance."  Id. at 690.

The "reasonable probability" of a different result required for Strickland prejudice is "a probability sufficient to undermine confidence in the outcome."  Id., at 694.  See also id. at 686 ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as

23

having produced a just result."); Harrington, 562 U.S. at 104  ("It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding.") (internal quotation and citation omitted).  Rather, "[c]ounsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. (internal citation and quotation omitted).  See also id. at 111-12 ("The likelihood of a different result must be substantial, not just conceivable") (internal quotations and citations omitted).

To prevail on habeas on an ineffectiveness claim that the state court has already rejected on the merits, a petitioner must show that "the state court applied Strickland to the facts of his case in an objectively unreasonable manner." Woodford v. Visciotti, 537 U.S. 19, 25 (2002). This is a formidable burden: "[s]urmounting Strickland's high bar is never an easy task," Padilla v. Kentucky, 559 U.S. 356 (2010), in part because the Strickland standard is "a general one" and, therefore, the "range of reasonable applications is substantial." Harrington v Richter, 562 U.S. 86, 105 (2011).  Further, "[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult [because] [t]he standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." Harrington, 562 U.S. at 105 (internal quotation and citation omitted); see also Cullen v. Pinholster, 563 U.S. 170, 190 (2011) ("review of [state court]'s decision is ... doubly deferential [because] [w]e take a highly deferential look at counsel's performance [under Strickland] through the deferential lens of § 2254(d)") (internal quotations and citations omitted) (emphasis added).  Finally, "habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under [section] 2254(d)." Id.  The difference is crucial: "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied

24

<u>Strickland</u>'s deferential standards."  <u>Id</u>. (emphasis added).  <u>See also</u> <u>Pinholster</u>, 563 U.S. at 196 (attorney need not state his reasons; rather, the court must "affirmatively entertain the range of possible reasons [ ] counsel may have had for proceeding as [he] did") (internal quotation marks omitted); <u>Greiner v. Wells</u>, 417 F.3d 305, 320 (2d Cir. 2005) (court must "look for legitimate justifications for [counsel's] conduct, including justifications transparent on the record and justifications offered by counsel").

Assessed under these doubly deferential standards, the Appellate Division's rejection of petitioner's ineffectiveness claim is not an unreasonable application of <u>Strickland</u>.  Plainly, the challenged line of questioning reflects a conscious choice by counsel who was otherwise competent and zealous throughout the proceedings—hence a trial strategy rather than a lapse or error—and arguably the analysis could end there.  It was not unreasonable for the Appellate Division to conclude that that strategy was legitimately intended to advance the principal defense theory of misidentification.

Whether the strategy bore fruit is another matter.  The cross, re-direct and re-cross examinations speak for themselves, and in addressing that portion of the record in summation counsel merely suggested that Cornelius Abson may have falsely implicated petitioner in this case.  Nevertheless, it would not have been unreasonable for the Appellate Division to conclude that counsel's intended, and arguably more legitimate, strategy was to adduce an evidentiary basis for arguing that, because petitioner had evaded identifications in twelve lineups that Platt conducted, Platt or his partner Del Pino might have had an incentive to influence the lineups here.

Assuming arguendo that the Appellate Division's view on the performance prong might falter under even the doubly deferential standard of review, on the theory that there was simply

no legitimate justification for opening the door to inadmissible evidence of violent, uncharged crimes that the prosecution itself had no intention of introducing, it was not unreasonable for the Appellate Division to conclude that that single error in judgment did not establish <u>Strickland</u> prejudice.  There was compelling evidence of petitioner's guilt of the crimes charged, the absence of a limiting instructing kept the spotlight off the inflammatory details, the prosecutor said mostly the right things by reminding the jurors that the uncharged robberies were not part of this case and that he did not intend to bring them up, and during their deliberations the jurors asked for readbacks of the two victims' accounts of the crime.  On this record, it was reasonable for the Appellate Division to conclude that the line of questioning that petitioner challenges did not "so undermine[ ] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  <u>Strickland</u>, 466 U.S. at 686.  <u>See</u> <u>also</u> <u>Harrington</u>, 562 U.S. at 111-12 ("The likelihood of a different result must be substantial, not just conceivable") (internal quotations and citations omitted).

C.  <u>Fair Trial</u>

1.  *The Evidentiary Branch of the Fair Trial Claim*

Petitioner claims he was denied a fair trial by the admission of his arrest photo, by the admission of testimony that allowed the inference that on the night of the crime Mendes identified his photograph, and by the admission of testimony that Mendes and Thomas had identified accomplice Darryl Bennett (which he says amounted to proof of guilt by association), and, treated separately here, <u>see</u> <u>infra</u> at p. 28, by portions of the prosecutor's summation that he says exacerbated these alleged errors.  He fully presented this set of assertions in his principal state appellate brief and the Appellate Division rejected it on the merits in a silent adjudication as one of "[t]he remaining contention in [his] main brief [that is] without merit." <u>Bailey</u>, 127

26

A.D.3d at 1223.

This claim does not present a basis for habeas relief principally because, despite the fact that petitioner has appended the phrase "fair trial," each of the challenged rulings involves state evidentiary law.  See generally Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").  This Court, therefore, need not delve into the state evidentiary law giving the trial court the discretion to make the rulings petitioner now challenges.  Further, even assuming that this Court had the authority to question the Appellate Division's determination that the challenged evidentiary ruling are correct under New York law, petitioner would not be entitled to habeas relief.  To establish that he was denied his right to a fair trial he would have to show that the evidence he says was improperly introduced "is so extremely unfair that its admission violates fundamental conceptions of justice."  Dowling v. United States, 493 U.S. 342, 352 (1990).  To meet this tests, the evidence would have to be "sufficiently material to provide the basis for a conviction or to remove a reasonable doubt that would have existed on the record without it."  Id. (internal quotation and citation omitted).  See also Brecht v. Abrahamson, 507 U.S. 619, 638 (1993) (error harmless unless it had a 'substantial and injurious effect or influence in determining the jury's verdict").  Petitioner cannot meet this standard.  Given the compelling nature of the victims' account of the crime, the reliability of their identifications, and the damaging evidence of petitioner's telephone calls to the victims, the Court concludes that the challenged evidentiary rulings and summation remarks did not deprive petitioner of a fair trial.

2.  *The Prosecutor's Summation*

The petition merely alleges that the prosecutor made "improper summation arguments." ECF No. 1 at 6.  The Court assumes petitioner intends to incorporate the arguments addressing

27

the prosecutor's summation raised in his main and supplemental appellate briefs.  Combined,
those two briefs replicate the arguments that counsel advanced in his post-summation mistrial
motion (discussed above) and include the additional argument that the prosecutor shifted the
burden of proof by remarking that there was no evidence of misidentification, that the
prosecutor's reference to the calls between petitioner and Bennett was an improper effort to
prove petitioner's "guilt by association,"  and that he failed in his duty to seek a just result when,
in addressing the uncharged robberies first brought out by the defense, he urged the jury to
"determine whether Cornelius Abson had it out for [petitioner]…or whether it was what
happened and Cornelius Abson was telling the truth." Def. App. Brief at 54-59

        The Appellate Division rejected the arguments in petitioner's main brief on the merits,
and those in his supplemental brief as unpreserved for appellate review and in any event without
merit.  Bailey, 127 A.D.3d at 1223.[11]  In so doing, the Appellate Division did not unreasonably
apply Supreme Court due process holdings regarding prosecutorial summation misconduct.  See
generally Darden v. Wainwright, 477 U.S. 168, 181 (1986) (the test is not whether prosecutor's
statements to the jury were "undesirable or even universally condemned… The relevant question
is whether the prosecutors' comments so infected the trial with unfairness as to make the
resulting conviction a denial of due process") (internal citation and quotation omitted).  The bulk
of the challenged remarks, as the trial court found, are fair comments upon the evidence,

---

[11] Only the pro se supplemental state appellate brief addresses the prosecutor's remark that
petitioner "told" the jury of his guilt through his "actions" of telephoning the victims, so that
branch of the prosecutorial misconduct claim is barred from review here under the independent
and adequate state law doctrine.  See Davila v. Davis, 137 S. Ct. 2058, 2064 (2017); Coleman v.
Thompson, 501 U.S. 722, 729 (1991).  The requisite cause and prejudice to lift the bar are not
established so the claim is not before the Court.  See Harris v. Reed, 489 U.S. 255, 262 (1989);
Wainwright v. Sykes, 433 U.S. 72, 87 (1977).

reasonable inferences to which that evidence gives rise, or fair characterization of the defense arguments.  Although the prosecutor should have avoided the subject of Cornelius Abson and the uncharged robberies, that one undesirable remark does not establish a due process violation under Darden.

    D.  The Jury Note(s)

Petitioner claims as follows: "The trial court responded to a jury note sent out . . . during its deliberations.  The first note was not read into the record in open court and the presence of counsel.  The second (third) (sic) was received and responded to, in open court, outside the presence of counsel, depriving counsel an opportunity to provide input rendering petitioner [a] deprivation of counsel during a pivotal stage."  ECF No. 1 at 8.  Petitioner raised a version of this claim in his pro se supplemental state appellate brief.  See Def. Supp. Brief at 5-7.   The Appellate Division rejected the claim as unpreserved, which means the claim is barred from review under the independent and adequate state law doctrine and because petitioner has not established the requisite cause and prejudice to bypass that bar. See note 11, supra.

In any event, the claim would not establish a basis for habeas relief.  First, petitioner presented the issue to the Appellate Division as "a mode of proceedings error" under state law, not a federal constitutional violation, so it does not present an issue cognizable on habeas. Estelle, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").[12]  Second, the claim appears to be frivolous.

-----

[12] Petitioner's pro se supplemental appellate brief cites New York C.P.L. §310.30, which provides, in pertinent part, that whenever a deliberating jury requests further information or instruction, the court "must direct that the jury be returned to the courtroom and, after notice to both the people and counsel for the defendant, and in the presence of the defendant, must give such requested information or instruction as the court deems proper."

There is of course no record basis for petitioner's claim that the court failed to make a record of one of the jury's notes, and petitioner's absence from the proceedings eliminates the possibility that his recollection might be credited.   Petitioner's separate assertion that the court responded to a jury note outside the presence of counsel is contradicted by the trial record.   <u>See</u> ECF No. 11-4 at 321-22 (reflecting the presence of counsel who both declined to go on the record before the jury is brought in, and the court then addressing the jury note that requested a readback of the victims' testimony).

## CONCLUSION

For all the reasons discussed, the application of petitioner Ralik Bailey for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied in its entirety.   Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.

SO ORDERED.

Dated:  Brooklyn, New York
         September 3, 2021


                                        _____s/_____
                                        RAYMOND J. DEARIE
                                        United States District Judge

30